IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN S.,[1] | ) | |
| | ) | Civil Action No. 7:22-cv-00438 |
| Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | By: C. Kailani Memmer |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff John S. ("John") filed this action challenging the final decision of the

Commissioner of Social Security ("Commissioner") finding him not disabled during the relevant

period between September 2007 and September 2009 and therefore ineligible for disability

insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. John

alleges that Administrative Law Judge Thomas Erwin ("ALJ") erred by (1) failing to perform a

function-by-function analysis and (2) failing to assign proper weight to the opinions of John's

treating providers.

This case is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 12,

2023. ECF No. 18. John did not request oral argument be scheduled in this case. *See* ECF No.

20. Having considered the administrative record, the parties' filings, and the applicable law, I

find that that the Commissioner's decision is not supported by substantial evidence. Accordingly,

and for the reasons detailed below, I respectfully recommend that the presiding District Judge

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security
opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi
as the defendant in this suit. No further action need be taken to continue this suit by reason of the last
sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**GRANT** John's Motion for Summary Judgment, ECF No. 12; **DENY** the Commissioner's

Motion for Summary Judgment, ECF No. 15; **REVERSE** the Commissioner's final decision

denying John's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. §

405(g); and **DISMISS** this case from the Court's active docket.

<u>**STANDARD OF REVIEW**</u>

The court limits its review to a determination of whether substantial evidence exists to

support the Commissioner's conclusion that John failed to demonstrate that he was disabled

under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and

alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing

that the standard for substantial evidence "is not high"). While substantial evidence is a

somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings."

*Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

[Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589). Nevertheless, the

court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment, which can be expected to result in death or
which has lasted or can be expected to last for a continuous period for not less than 12 months." 42
U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant
suffers from an impairment which affects his ability to perform daily activities or certain forms of work;
instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial
gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2),
1382c(a)(3)(B).

the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

On May 27, 2008, John first filed for DIB alleging disability beginning May 2, 2008. R. 15, 110. However, after that claim was denied, John did not seek further review. *Id.*

On December 9, 2011, John filed for DIB a second time with an alleged onset date of August 1, 2007. *Id.* That claim was denied initially and on reconsideration, and John again did not seek further review. *Id.*

On May 28, 2013, John filed for DIB a third time with an alleged onset date of December 18, 2012. R. 110. That claim was denied on June 3, 2013, and John did not appeal that denial. *Id.*

His fourth and present claim was filed on January 15, 2014, alleging disability beginning on September 1, 2007. R. 104, 295–97. After the ALJ determined there was new and material evidence such that this fourth claim was not barred by *res judicata*, R. 110–11, the claim was denied initially and on reconsideration. R. 15. John appeared before the ALJ by online video on May 26, 2021. R. 43–103. John's father, Walter Jr., testified on John's behalf. R. 87–97. Asheley Wells testified as an impartial vocational expert. R. 98–101. The ALJ issued an "Unfavorable

3

Decision" analyzing John's claim under the familiar five-step process[4] on June 17, 2021; finding that John was not under a disability from September 1, 2007, through September 30, 2009, the date last insured; and denied John's claim for benefits. R. 12–28.

At the first step, the ALJ found that John had not engaged in substantial gainful activity during the period from the alleged onset date of September 1, 2007 through the date last insured of September 30, 2009. R. 18. At the second step, the ALJ found that John had the following severe impairments through the date last insured: median arcuate ligament syndrome with stenotic celiac artery and repair surgery; gastropareses; gastritis; anxiety; and depression. *Id.*

As to the third step, the ALJ found that John's impairments, either individually or in combination, did not meet or equal a listed impairment. *Id.* The ALJ specifically considered Listing 5.06 (inflammatory bowel disease), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorder) R. 19. The ALJ found that John has no limitation in understanding, remembering, and applying information, as well as in interacting with others. R. 19–20. The ALJ found that John has mild limitations in adapting or managing oneself. R. 20. The ALJ found that John has moderate limitations with regard to concentrating, persisting, or maintaining pace. *Id.*

The ALJ concluded that John had the residual functional capacity ("RFC") to:

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a *prima facie* case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

Perform light work as defined in 20 C.F.R. 404.1567(b) except [John] had to avoid all unprotected heights like ladders, ropes, or scaffolds. He could occasionally climb ramps and stairs, and tolerate occasional exposure to pulmonary irritants (such as fumes, odors, dusts, gases, and poorly ventilated areas) and other hazards like hazardous machinery. [John] required access to a restroom on regular breaks. He could not perform production or pace work, which is defined as having to keep up with an assembly line or in a job with strict quotas.

R. 21.

At the fourth step, the ALJ concluded that John had no past relevant work. R. 26. At the fifth step, the ALJ identified jobs in significant numbers in the national economy that John could perform, including positions as an office helper, addressing clerk, or mail clerk. R. 27. Thus, the ALJ determined that John was not disabled at any time from September 1, 2007, the alleged onset date, through September 30, 2009, the date last insured. R. 28. This appeal followed.

## ANALYSIS

John argues that the ALJ erred by (1) failing to perform a function-by-function analysis and (2) failing to properly assess the opinions of John's treating providers. *See* ECF No. 13 at 3–16.

### A. Medical History Overview For the Relevant Period[5]

John was born on April 7, 1982. R. 104. He is a college graduate with both an associate's degree and a bachelor's degree. R. 58.

John underwent gallbladder removal surgery on January 9, 2001. R. 474–75.

---

[5] For purposes of this report and recommendation, the "relevant period" is September 1, 2007 (John's alleged disability onset date) through September 30, 2009 (John's date last insured). R. 16; *see Johnson v. Barnhart*, 434 F.3d 650, 656 (4th Cir. 2005) ("To qualify for DIB, [the claimant] must prove that [he] became disabled prior to the expiration of [his] insured status."); 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a).

A December 2006 letter from Mark A. Ringold, M.D., of New River Gastroenterology, indicates that a biopsy taken from John during an endoscopy was indicative of celiac disease. R. 793.

The record shows that from May 18, 1999, to at least July 30, 2012, John continually returned to the care of Roy H. Crouse, Ph.D, of Family & Psychology Services, Inc., for issues including chronic pain, anxiety, depression, panic attacks, poor concentration, and severe insomnia. R. 540–581, 988–1030; 1903–1921.

On December 11, 2007, John presented to the care of Dr. Ringold for a follow-up visit. R. 789–91. John complained of lower abdominal pain and nausea that had persisted for several weeks. R. 789. He reported that he was taking 800 mg ibuprofen three times daily. *Id.* Dr. Ringold started John on a trial of 40 mg Protonix daily and noted that if symptoms did not improve, then John would need to be evaluated for an abdominal hernia. R. 791.

On December 17, 2007, John returned to the care of Dr. Crouse. R. 1001. John complained of worsening depression and disturbed sleep. *Id.* Dr. Crouse noted that John's pain "may be a factor in his depression, as well as his sleep." *Id.*

On February 8, 2008, CT imaging of John's abdomen revealed no abnormal findings aside from a somewhat hyperdistended urinary bladder. R. 829.

The record indicates that from March 12, 2008, to February 15, 2021, John repeatedly presented to the care of Kenneth Koch, M.D., of Wake Forest University Baptist Medical Center. R. 967–87; 1486–1542; 2887–3080; 4555–4621; 5835–7448. The focus of these visits to Dr. K. Koch during the relevant period was treatment for John's gastrological impairments. *See* 1528–41.

On March 17, 2008, John returned to the care of Dr. Crouse. R. 1000. John stated that he "can't live with this pain." *Id.* He reported that he was sleeping between two and three hours at night, vomiting between ten and twenty times daily, and that he was crying from his pain. *Id.*

On March 27, 2008, John returned to the care of Dr. Crouse. R. 999. He reported that his gastrointestinal problem was still severe and affecting his concentration and memory. *Id.* He reported disturbed sleep after four hours, as well as nausea. *Id.* He stated that he "can't focus on [his] studies" because of his problems. *Id.*

In a letter dated March 27, 2008, Dr. Crouse writes that John's current diagnosis included moderate major depressive disorder, generalized anxiety disorder, and pain disorder associated with both psychological factors and a general medical condition. R. 659. Dr. Crouse explains that "[a]t times, [John's] depression has been severe enough that he has felt suicidal." *Id.* He further explains that "[d]ue to [John's] numerous medical problems he has had significant pain at times, but recently his pain has been almost unbearable." *Id.*

On April 4, 2008, John returned to the care of Dr. Crouse. R. 998. He rated his pain at 9 out of 10 and reported severe anxiety and pain. *Id.* He stated that he was "very depressed," and slept for only three hours the previous night. *Id.*

Later that day on April 4, 2008, John presented to the emergency department at Carilion New River Valley Medical Center with complaints of vomiting. R. 828–33. He reported that his vomiting began two days prior, and that he had been vomiting numerous times each day. R. 828. He described severe left-side abdominal pain which he rated as 10 out of 10. R. 828–29. John intravenously received 4 mg morphine and 12.5 mg Phenergan, which he reported "[did] not help much," and his pain remained at a 10 out of 10. R. 829. He then intravenously received 3 mg Dilaudid. *Id.*

On April 15, 2008, John returned to the care of Dr. Crouse. R. 997. John reported severe pain, insomnia, poor concentration, moderate anxiety, and depression. *Id.* Dr. Crouse noted that the therapeutic focus for John included "[c]ognitive therapy for his feelings of hopelessness about his medical problems." *Id.*

On October 2, 2008, John returned to the care of Dr. Ringold with complaints of abdominal pain and vomiting. R. 786–88. John reported that he had recently been to the emergency room for his abdominal pain and vomiting, and that he had vomited up to ten times daily for the past two weeks. R. 786. He reported a sharp lower left quadrant pain that radiated to his rectum. *Id.*

On November 26, 2008, John returned to the care of Dr. Crouse. R. 994. Dr. Crouse notes that John "is having trouble coping with his pain." *Id.*

A December 2008 letter from Donald Zedalis, M.D., of Allergy & Asthma Associates of Southwest Virginia, Inc., indicates that John suffered significant difficulties falling asleep, and that John frequently wakes during the night because of nightmares. R. 796. Dr. Zedalis requested that another doctor reconsider instituting Lunesta into John's medical regimen. *Id.*

On December 3, 2008, John presented to the care of Kristin Short, PA, at Physiatry Medicine New River Valley for an office visit. R. 815–17. John complained of worsening abdominal and pelvic pain. R. 815. John expressed frustration with his pain and indicated that it was interfering with his activities. *Id.* He rated his pain as a 7 out of 10. R. 816. Ms. Short increased John's trazodone to no more than 6 tablets at bedtime. R. 817.

On December 8, 2008, John returned to the care of Dr. Crouse. R. 993. John stated, "I am losing my mind." *Id.* Dr. Crouse noted that John was depressed because "he cannot live independently." *Id.*

8

On December 10, 2008, John returned to the care of Ms. Short for a follow-up appointment. R. 812–14. John complained of worsening abdominal pain that was occurring more frequently. R. 812. He reported that Lortab alleviated "50%" of his pain. *Id.* He indicated that he struggled with staying asleep because of his pain, anxiety, and insomnia. *Id.* He reported that he was doing well in school and was getting mostly "B's." *Id.* He rated his pain as 8 out of 10. R. 813. Ms. Short recommended a CT angiogram of John's abdomen; referral for a possible exploratory laparoscopy per John's request; started John on 2 mg Lunesta; and increased his Lortab to 7.5/500 mg. R. 814.

On December 19, 2008, John returned to the care of Ms. Short for a follow-up appointment. R. 810–11. John asked whether he could be on a longer-acting medication. R. 810. Ms. Short recommended trying a 25 mg Duragesic patch for longer acting control. R. 811. She informed John that he could take his prescribed Lortab only when his pain was uncontrolled by his fentanyl patch. *Id.*

On December 28, 2008, John presented to the emergency department at Raleigh General Hospital with complaints of abdominal pain. R. 840–41. John described the left-sided abdominal pain as stabbing, and it was associated with nausea, vomiting, and some loose stool. R. 840. He stated that he was "in severe pain all the time." *Id.* He stated that both his abdominal pain and vomiting had worsened in recent days, with his vomiting becoming projectile. *Id.* John received a prescription for 20 mg Bentyl for abdominal pain. R. 848.

On January 5, 2009, a CT arteriogram revealed evidence of celiac artery compression, most likely at the media arcuate ligament. R. 855.

In a January 2009 letter from David Strider, N.P., Mr. Strider indicates that John desired to undergo surgical intervention for possible median arcuate ligament syndrome. R. 850–52.

On January 9, 2009, John underwent an operation at UVA Hospital East in Charlottesville, Virginia to release the median arcuate ligament and reconstruct the celiac artery. R. 856–68. Final diagnosis confirmed median arcuate ligament syndrome. R. 858.

On March 6, 2009, John returned to the care of Dr. Kenneth Koch. R. 1540–41. John reported that he was experiencing continued nausea, vomiting, and epigastric pain, as well as frequent diarrhea over the past several weeks. R. 1540. Dr. Koch noted that John "is in considerable distress with these symptoms." *Id.*

On April 22, 2009, John returned to the care of Dr. Kenneth Koch for a follow-up appointment on his nausea, vomiting, and abdominal pain. R. 1536–37. John reported concern about a sharp pain in his left lower quadrant that lasted between five minutes and an hour, which worsened after bowel movements. R. 1536. John reported an ongoing issue with constipation. *Id.*

On June 8, 2009, John returned to the care of Dr. Crouse. R. 990. John stated "I can't go on much longer." *Id.*

On July 1, 2009, John returned to the care of Dr. Kenneth Koch for a follow up on nausea, vomiting, and abdominal pain. R. 1533–35. John reported concern about continued pain in his left lower quadrant, as well as nausea and frequent loose, watery stools. R. 1533. He underwent a gastric emptying study that day that was within normal limits. *Id.* Dr. Koch opined that John's symptoms were likely due to irritable bowel syndrome with diarrhea predominance. R. 1534.

On August 12, 2009, John returned to the care of Dr. Kenneth Koch. R. 1530–32. John reported occasional nausea and loose stools but indicated that his urogenital pain was improving. R. 1528.

B.  **Medical Opinion Summary**

On July 11, 2008, Dr. Crouse, as one of John's treating providers, completed a "Mental Status Evaluation Form" for Disability Determination Services. R. 484–88. Dr. Crouse indicated that John "has had several episodes of significant suicidal ideation." R. 486. He noted that John's immediate memory "can be significantly impaired if pain or anxiety levels are high." *Id.* He noted that John experienced "only brief episodes [of delusions or hallucinations] which were the result of medication." *Id.* He noted that John "has had episodes of significant confusion related to pain level." *Id.* He noted that John's attention span, concentration, persistence and task completion "are excellent except for during periods of pain and anxiety, during which they can be moderately impaired." R. 487.

On March 2, 2016, Carol Ballard, FNP, one of John's treating providers, opined that John could sit, stand, or walk for less than two hours in an 8-hour workday, as well as occasionally lift less than 10 pounds. R. 4488. Ms. Ballard opined that John's experience of pain or other symptoms were severe enough to frequently interfere with John's attention and concentration. *Id.* She opined that John is likely to be absent more than four times a month as a result of his impairments. *Id.* She opined that John required a job which permits ready access to a restroom, and that he would sometimes need to take unscheduled restroom breaks during an 8-hour workday. R. 4489. Ms. Ballard specified that those limitations "relate back to 09/01/07, the date [John] alleges he became disabled." *Id.*

On April 22, 2016, Kenneth L. Koch, M.D., one of John's treating providers, completed a "Residual Functional Capacity Questionnaire: Chronic Bowel Problems." R. 4491–92. In that questionnaire, Dr. Koch identified John's symptoms as including chronic diarrhea; abdominal pain and cramping; loss of appetite; and nausea. R. 4491. He opined that John's experience of

11

pain or other symptoms was constantly severe enough to interfere with attention and

concentration. *Id.* He opined that John would need a job that permits ready access to a restroom.

*Id.* He opined that John would need to take hourly unscheduled restroom breaks during an 8-hour

workday, and that such unscheduled breaks would cause him to be away from the work station

for an average of 20 minutes. *Id.* He opined that John would likely be absent for an average of

more than four days per month as a result of his impairments or treatment. R. 4492. He stated

that those limitations relate back to September 31, 2007, the date John alleges he became

disabled. *Id.*

On November 19, 2018, Michael Koch, M.D., completed a "Physical Residual Functional

Capacity Assessment" for John through the date last insured, September 30, 2009. R. 2490–97.

Dr. Koch opined that, through the date last insured, John could occasionally lift 20 pounds;

frequently lift 10 pounds; stand, sit, or walk for about 6 hours in an 8-hour workday; frequently

stoop and crawl; and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor

ventilation. R. 2491–94. Dr. Koch explained that:

> [John's] pain can be reasonably attributed to his history of surgeries and celiac
> disease. The symptom-imposed limitations appear to be partially consistent. The
> severity of the symptoms and the alleged effect(s) on function are not entirely
> consistent with the total medical and non-medical evidence, including statements
> by [John] and others, observations regarding [activities of daily living], and
> alterations of usual behavior or habits. Some symptoms appear to be
> disproportionate to the severity and duration that would be expected, based on the
> claimant's medically determinable impairment(s). The RFC is reduced accordingly
> and remains with appropriate restrictions to compensate for the impairments and
> associated symptoms that can be medically determined.

R. 2495.

### C.  Administrative Hearing Testimony

At the administrative hearing on May 26, 2021, John testified that during the relevant

period he suffered from abdominal pain, nausea, and vomiting. R. 72–74. He explained that he

suffered from these symptoms on a daily basis. R. 74. He testified that treatment for his medical impairments included injections, nerve blocks, spinal cord stimulators, and dorsal root ganglion stimulators, but that no treatment was effective at abating his symptoms. R. 75–76.

John testified that if he had been working during the relevant period, then he would have needed to take unscheduled breaks throughout the course of the day. R. 76. He testified that he spent most days in his bed because of his pain and nausea. *Id.* He testified that he would go for two or three days without eating or drinking to combat his issue with nausea and vomiting, which often resulted in hospitalization for dehydration. R. 77–78. He testified that he was diagnosed with diabetes when he was nine years old. R. 78.

John testified that he struggled with mental health issues during the relevant period. R. 79–81. He testified that he was hopeless and thought he was losing his mind. R. 80. He testified that he was suicidal towards the end of the relevant period, and that he intended to kill himself by hanging because of his pain. *Id.*

John testified that he has seen Dr. Crouse since he was in high school. R. 84–85. He testified that he has seen Ms. Ballard as his primary care provider since he was sixteen or seventeen years old. R. 85.

John's father, Walter Jr., testified that, during the relevant period, John's pain caused John to go without sleep for multiple days. R. 89. He testified that John's symptoms would be continuous for multiple days. R. 89–90.

### D. The Commissioner's Decision is Not Supported by Substantial Evidence

John argues that the ALJ erred by (1) failing to perform a function-by-function analysis and (2) failing to properly assess the opinions of John's treating providers. *See* ECF No. 13 at 3–16.

1.  **The ALJ's Assessment of John's Physical Impairments and RFC Findings**

First, John argues that the ALJ erred in his assessment of John's physical impairments by failing to determine John's RFC using a function-by-function analysis. *See* ECF No. 20 at 43. Importantly, with regard to John's severe gastrointestinal disorders, John argues that "there is effectively no functional limitation assigned in [his] RFC relating to these 'severe' conditions." ECF No. 13 at 5.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. *See* SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In *Thomas v. Berryhill*, 916 F.3d 307, 311, the Fourth Circuit explained "that a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." The logical explanation component "is just as important as the other two," and "meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Id.* Importantly, the Fourth Circuit instructs that the ALJ's RFC determination "warrants some explanation." *Id.* at 312 (emphasis added).

Here, the ALJ erred by failing to adequately explain—or to provide any explanation whatsoever—how a limitation that required "access to a bathroom on regular breaks," accounted

14

for John's documented severe gastrological impairments. As John correctly points out, such a limitation "is simply a routine feature that is available to the vast majority of employees in this country." ECF No. 13 at 5. Furthermore, in reviewing the ALJ's opinion as a whole, the undersigned cannot find anything in the ALJ's opinion that resembles the "logical explanation" component of a proper RFC analysis for any of the RFC limitations.

The ALJ is required to "build an accurate and logical bridge from the evidence to his conclusions," *Monroe*, 826 F.3d at 189, but here I find the ALJ has done no such thing. He provides no logical explanation for how the limitations in the RFC address John's impairments. As a result, this Court is "left to guess" at how he arrived at his conclusions, and so remand is warranted. *Mascio v. Colvin*, 780 F.3d 632, 636.

### 2. The ALJ's Evaluation of Treating Providers' Opinions

As this case was filed before March 27, 2017, the standard by which the ALJ evaluates treating providers' opinions is governed by 20 C.F.R. § 404.1527. When reviewing whether an applicant is eligible for disability benefits, the ALJ must evaluate every medical opinion in the record "regardless of its source."[6] 20 C.F.R. § 404.1527(b)–(c). In addition, the ALJ must adhere to the "treating source rule." *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983). Under the "treating source rule," the applicant's treating physician's opinion is entitled to controlling weight in the ALJ's analysis, unless there is persuasive, contradictory evidence.[7] *Id.*

As the Fourth Circuit recently explained in *Easterbrook v. Kijakazi*, 2023 U.S. App. LEXIS at *13 (4th Cir. 2023), "[m]edical opinions from 'treating sources' are given controlling

---

[6] 20 C.F.R. §§ 404.1520c, 4106.920c applies to claims filed on or after March 27, 2017, and focuses primarily on the "supportability" and "consistency" of treating providers' opinions.
[7] The regulation defines a "treating source" as the applicant's "acceptable medical source who provides [the applicant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the applicant]." 20 C.F.R. § 404.1527(a)(2).

weight because 'these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the applicant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." (quoting 20 C.F.R. § 404.1527(c)).

While a treating source's opinions are entitled to controlling weight, the ALJ may determine that such opinions are not entitled to controlling weight by considering the following factors: (1) the length of the physician's treatment relationship with the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) whether the medical evidence in the record supports the physician's opinion; (5) the consistency of the physician's opinion with the entirety of the record; and (6) the treating physician's specialization. *See Shelley C. v. Comm'r of SSA*, 61 F.4th 341, 354 (4th Cir. 2023). "**None of these factors may be omitted or disregarded** by the ALJ in weighing the value of a treating physician's opinion." *Ricks v. Comm'r*, No. 2:09-cv-622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citing *Burch v. Apfel*, 9 Fed. App'x 255, 259 (4th Cir. 2001)) (emphasis added). The Fourth Circuit has explained that "mere acknowledgment of [20 C.F.R § 404.1527(c)'s six factors] is insufficient and falls short of the ALJ's duties." *Shelley C.*, 61 F.4th at 354.

The ALJ failed to adequately explain his evaluation of Dr. Kenneth Koch's and Ms. Ballard's opinions regarding John's limitations. The ALJ states that:

> Carol Ballard, FNP, and Dr. Kenneth Koch have both offered opinions indicating [John] could not even perform sedentary work or would require multiple absences a month. Both providers indicated the limitations had been present since the alleged onset date. However, they both reference conditions not present until 2011 or later, such as cerebral palsy and bacterial overgrowth of the small bowel. It also appears the providers offered the opinions in part on the claimant's self-report, as Dr. Koch was not treating [John] in 2007.

R. 26.

This explanation for why the ALJ discounts the opinions of both Dr. Koch and Ms. Ballard is simply baffling. Ms. Ballard's opinion was written March 2016, while Dr. Koch's opinion was written in April 2016. Both providers "reference" those conditions only insofar as they indicate those are diagnoses that John had at the time their opinions were written. Next, it is unclear to the undersigned why the ALJ would discredit those providers' opinions because they both noted diagnoses that John had at the time of their opinions; their opinions would likely be equally as suspect had they omitted John's diagnoses at that time. Lastly, and perhaps most egregiously, the ALJ states that "Dr. Koch was not treating [ John] in 2007," but that statement ignores the fact that Dr. Koch was treating John during the relevant period throughout 2008 and 2009. R. 1528–41. As the ALJ failed "to build an accurate and logical bridge from the evidence to his conclusions" about the opinions of John's treating providers, remand is warranted.

Furthermore, I find that there is additional error in how the ALJ evaluated the opinions of Dr. Crouse, Dr. Kenneth Koch, and Ms. Ballard, who were John's treating providers. While the ALJ properly explained how he had to evaluate the opinions of John's treating providers, R. 24, he did not engage in any discussion as to how the six factors under 20 C.F.R. § 404.1527(c)(1)– (6) applied to those treating providers' opinions. In other words, the ALJ merely acknowledged the six factors under 20 C.F.R. § 1527(c) without providing any analysis related to those factors. The Fourth Circuit has explained that "mere acknowledgment of [20 C.F.R § 404.1527(c)'s six factors] is insufficient and falls short of the ALJ's duties." *Shelley C.*, 61 F.4th at 354. As the ALJ here merely acknowledged the six factors under 20 C.F.R. § 404.1527(c) without applying them in his analysis of the opinions of John's treating providers, remand is warranted.

### 3. The ALJ's Evaluation of John's Subjective Allegations

In determining a claimant's RFC, the ALJ must evaluate the claimant's subjective symptoms using a two-part test. *Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017). First, the ALJ must determine whether objective evidence shows the existence of a medical impairment that could reasonably be expected to produce the alleged symptoms. *Id.* (citing 20 C.F.R. § 404.1529(b)). Once the claimant makes that showing, the ALJ must evaluate the extent to which the symptoms limit the claimant's capacity to work. *Id.* (citing 20 C.F.R. § 404.1529(c)). At this second stage, the ALJ must consider all available evidence, including medical history, objective medical evidence, and statements by the claimant. *Id.* To evaluate the claimant's statements, an ALJ must "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id.* (quoting SSR 16-3p, 2016 SSR LEXIS 4, at *2 (S.S.A. Mar. 16, 2016).

The Fourth Circuit has "consistently held that 'while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity.'" *Arakas v. Comm'r*, 983 F.3d 83, 95 (4th Cir. 2020). Instead, "a claimant is entitled to rely exclusively on subjective evidence to prove the second part of the test." *Id.* (citation omitted). In *Arakas*, the Fourth Circuit found that while the ALJ made a correct step one finding, he erred at the second step when he "improperly discredited [the claimant's] statements about the severity, persistence, and limiting effects of her symptoms because [the ALJ] did not find them to be 'completely consistent with the objective evidence.'" *Id.* The Fourth Circuit held that an ALJ errs when he discredits a claimant's complaints based on

the lack of objective evidence corroborating them, as that "improperly increases [the claimant's] burden of proof." *Id.*

I find that the ALJ has committed a similar error here. At the first step, the ALJ concluded that John's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 24. At the second step, however, he concluded that "[John's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* The ALJ then moves into a discussion about the "treating source" rule and then evaluates the opinions of John's treating providers. R. 24–26. After that, the ALJ states:

> [A] claimant's allegations are given less weight when the record contains weak or inconsistent objective medical findings. The stronger the correlation between the objective findings and the subjective complaints, the more probative the subjective complaints become. Here, the claimant's subjective complaints are out of proportion with the weak and inconsistent objective medical findings contained in the record.

R. 26.

It is not clear to the undersigned what the ALJ is referring to regarding "inconsistent objective medical findings" from the relevant period. Yet insofar as the ALJ is discrediting John's subjective allegations because of the lack of objective medical evidence to corroborate those statements, I find that he committed the same type of error which warranted remand in *Arakas*.

## <u>CONCLUSION</u>

For the foregoing reasons, I find there is not substantial evidence to support the Commissioner's decision. Therefore, I respectfully recommend that the presiding District Judge **GRANT** John's Motion for Summary Judgment, ECF No. 12; **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 15; **REVERSE** the Commissioner's final decision

19

denying John's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. §

405(g); and **DISMISS** this case from the Court's active docket.

### <u>NOTICE TO PARTIES</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party must serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual

recitations or findings, as well as to the conclusion reached by the undersigned, may be

construed by any reviewing court as a waiver of such objection, including the waiver of the right

to appeal. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in

this matter to the Honorable Robert S. Ballou, United States District Judge.

The Clerk is directed to serve copies of this Report and Recommendation to all counsel

of record and any unrepresented parties.

Entered:  March 5, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge